955 F.2d 45
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Arthur Albert BOOTH, Defendant-Appellant.
 Nos. 91-1810, 91-1812.
 United States Court of Appeals, Sixth Circuit.
 Feb. 13, 1992.
 
 Before RALPH B. GUY, Jr., and ALAN E. NORRIS and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant, Arthur Booth, was convicted by a jury on six counts of filing false tax returns. 26 U.S.C. § 7206(1). On appeal, Booth raises only one issue. He claims he was denied a fair trial as a result of an evidentiary ruling made by the trial judge which allegedly prevented defense counsel from showing bias on the part of a government witness.
 
 
 2
 Upon a review of the record, we conclude that any error made in the evidentiary ruling was harmless beyond a reasonable doubt, and we affirm.
 
 I.
 
 3
 Due to the discrete nature of the issue raised on appeal, we need set forth only a general overview of the facts which led to this prosecution.
 
 
 4
 Booth, who was aptly described by one witness at trial as a "wheeler-dealer," was involved in a number of business enterprises with a number of different people. The financial records for these businesses were kept in a very informal manner and were in a state of chaos after Booth went through a divorce in the early 1980s. In 1982, Booth met Patricia Jones, a bookkeeper with an associate's degree in accounting. Booth hired Jones "to get his taxes together." Jones went to work for Booth and after four months had brought some semblance of order to the records. Over time, she began to assume other responsibilities, including business partner, lover, and confidant. She continued to do all the paperwork and was responsible for the preparation of the data that was used by Donald Harger, an accountant who prepared defendant's individual and business tax returns.
 
 
 5
 Without going into detail, suffice it to say Jones testified that, either at defendant's direction or with his knowledge and consent, she falsified a number of records. Income was consistently underreported because cash transactions were not entered into the ledgers. The testimony of Jones was very damaging and, if believed, was more than adequate to support defendant's conviction.
 
 
 6
 The main thrust of the defense was to attack Jones' credibility. The attack primarily focused on the fact that Jones had a cocaine addiction[1] and, of course, was also guilty of aiding and abetting the filing of false tax returns.[2]
 
 
 7
 Booth's second line of defense was that he was one of those persons who was good at business but bad at paperwork and just did not know what was going on insofar as the financial records were concerned. The government countered this defense in part by calling two witnesses who testified that Booth had stated that he had structured everything so Jones would be responsible if anything ever happened. One of these witnesses was Joey B. Andrews, Jr. Andrews was a business partner with Booth in one of his ventures, Galaxy World Amusements, from 1981 until 1986. The break-up in 1986 resulted in a lawsuit between the parties which ultimately was settled when Booth paid Andrews $20,000. On both direct and cross-examination, Andrews' testimony clearly indicated that the break-up was not on friendly terms. In an attempt to soften the impact of Andrews' testimony, the defense called attorney Andrew Burch. Burch had at one time or another done legal work for both Andrews and the defendant. Burch testified that Andrews contacted him about instituting litigation against Booth after Booth and Andrews had a "falling out." Defense counsel sought to elicit from Burch certain statements made by Andrews to Burch. The government objected, arguing both hearsay and the attorney-client privilege. The defense then made an offer of proof, and it is the trial judge's ruling sustaining the government's objection on the basis of the attorney-client privilege that is the basis of this appeal.
 
 
 8
 On the separate record, Burch testified that Andrews called him on the telephone and asked him to file suit against Booth. Burch declined because Booth had also been a client of his. Burch testified that Andrews called again the next day and angrily declared "that he was going to see that I paid for this ... and that he would also see that Mr. Booth paid for not paying the money that was in dispute." Defendant argues that the jury should have heard this testimony in order to show bias on the part of Andrews.
 
 
 9
 The court's decision to exclude the proffered testimony turned on its factual determination that an attorney-client relationship still existed between Andrews and Burch when these statements were made.
 
 
 10
 THE COURT: Did you--I think that you understand the issue. When did the representations cease for all time? At what point in time did that cease?
 
 
 11
 THE WITNESS: Ah, we had the first conversation. That was relatively smooth. I said: "Joey, I can't do this. I won't sue my clients." And I recommended some lawyers that he might use.
 
 
 12
 The second conversation as I indicated was very hostile, and that, that day or the next day I wrote him a letter, and I told him that in my opinion our relationship of any kind was over. I told him in the letter that it has been a long time since I took abuse like that from anyone. Basically, I told him it was a good thing he was in Florida and I was in Michigan, and that, that I would never--in fact, I never talked to him since then.
 
 
 13
 MR. GRAHAM: The time that he made the threat to you, did you consider him a client of yours?
 
 
 14
 THE WITNESS: I--
 
 
 15
 THE COURT: Two seconds before he made the threat, or one second, or a millimeter of a second?
 
 
 16
 THE WITNESS: Well, there, there is no question that this was a long term relationship. I, I don't know when it ended. It certainly ended the minute we hung up the phone, and I, I--I can't tell you what was in the mind of Mr. Andrews because I don't know. I think that there was a matter pending at that time that was concluded very shortly, and I, I have never talked to him again. So--
 
 
 17
 THE COURT: You did conclude a matter after that?
 
 
 18
 THE WITNESS: Your Honor, I believe--I don't want to give the Court the wrong idea. I believe that matter had been concluded, but the paperwork was following it.
 
 
 19
 THE COURT: So there was still work to be done?
 
 
 20
 THE WITNESS: Well, it was a matter--
 
 
 21
 THE COURT: The paperwork was following it?
 
 
 22
 THE WITNESS: That is correct.
 
 
 23
 (App. at 344-46).
 
 
 24
 Although the factual finding by the court is reviewed under the indulgent abuse of discretion standard, we nonetheless find the call to be a very close one. We believe the trial judge correctly found the existence of an attorney-client relationship, but not all statements made by a client to his attorney are privileged. For example, if the client called up and said he would harm the attorney if his bill for services was not reduced, we doubt that anyone would seriously contend this was a privileged communication. We do not mean by this example to suggest that Andrews' statements were of such a nature, but they might reasonably be construed as a signal of the termination of the attorney-client relationship. We find it unnecessary to resolve this question, however, since we conclude that if the trial judge erred, the error was harmless beyond any reasonable doubt.
 
 
 25
 To begin with, Andrews' statement was ambiguous at best. When he stated that "he would see that Mr. Booth paid for not paying the money that was in dispute," he could well have been referring to the very lawsuit that he unsuccessfully tried to get Mr. Burch to bring on his behalf. Indeed, Andrews did make Booth pay for it--to the tune of $20,000. More importantly, however, it was crystal clear to the jury that there was no love lost at this point between Booth and Andrews. Whatever little would have been added by the statement the court excluded was cumulative. Furthermore, Andrews was not the only person who testified that Booth was setting up Patricia Jones to take the blame if anything went wrong.
 
 
 26
 Defendant's attempt to claim denial of a fair trial as a result of this one bit of excluded testimony simply ignores all of the other damaging evidence introduced against him.[3]
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 Jones testified that the defendant himself had secured cocaine for her on a number of occasions
 
 
 [2]
 Although Jones was not testifying under a grant of immunity from the IRS, she apparently has not been prosecuted to date. She also is eligible for a reward for snitching to the IRS about Booth. The local prosecutor did promise not to bring state drug charges
 
 
 [3]
 We note in passing that we find no merit to the government's argument that this testimony was hearsay. It was not offered to prove the truth of the matter asserted, but only to show that such a statement was made. As such, it does not fall within the definition of hearsay. Fed.R.Evid. 801(c)